**In the**
**United States Court of Appeals**
**for the Eighth Circuit**

———————

A.J.T., a minor child, by and through her parents, A.T. and G.T.

*Plaintiff - Appellant*

v.

Osseo Area Schools, Independent School District No. 279; Osseo School Board

*Defendants - Appellees*

Council of Parent Attorneys and Advocates, Inc.

*Amicus on Behalf of Appellant(s)*

———————————————

On Appeal from the United States District Court
For the District of Minnesota
Case No. 21-cv-1760 (MJD)

———————————————

**BRIEF OF DEFENDANTS - APPELLEES**

———————————————

LAURA TUBBS BOOTH (#186910)
CHRISTIAN R. SHAFER (#387947)
ADAM J. FRUDDEN (#400068)
Ratwik, Roszak & Maloney, P.A.
444 Cedar Street, Suite 2100
Saint Paul, MN 55101
Tel: (612) 339-0060

*Attorneys for Defendants - Appellees Osseo Area Schools,*
*Independent School District No. 279 and Osseo School Board*

# SUMMARY OF THE CASE

Based on medical information provided by the parents ("Parents") of A.J.T. ("Student"), and through the process prescribed by the Individuals with Disabilities Education Act ("IDEA"), Osseo Area Schools ("District") proposed an Individualized Education Program ("IEP") with an altered school day for the Student, who cannot attend school until noon. In addition to challenging that IEP through an IDEA due process hearing—which is the subject of another appeal currently before this Court—the Parents sued the District, alleging that the District discriminated against the Student in violation of Section 504 of the Rehabilitation Act ("Section 504") and the Americans with Disabilities Act ("ADA"). Based on the voluminous record and this Court's well-settled precedent, the District Court granted the District's Motion for Summary Judgment and dismissed the Parents' discrimination claims.

As the District Court correctly found, there are no disputed issues of material fact. The District did not act with the requisite "bad faith" or "gross misjudgment" when it developed and implemented IEPs for the Student. This Court should affirm the District Court's decision as, under any potentially applicable standard, the District did not discriminate against the Student.

The District requests 20 minutes to present its oral argument to the Court in light of the nuanced legal issues and the detailed factual record in this case.

# TABLE OF CONTENTS

SUMMARY OF THE CASE ................................................................ ii

TABLE OF CONTENTS ................................................................. iii

TABLE OF AUTHORITIES ............................................................. v

STATEMENT OF THE ISSUES ....................................................... 1

STATEMENT OF THE CASE .......................................................... 2

    I.     PROCEDURAL POSTURE............................................... 2

          A.    Appellate Case No. 22-3137.............................. 2

          B.    This Matter........................................................ 3

    II.    STATEMENT OF THE FACTS ......................................... 4

          A.    Osseo Area Schools............................................ 4

          B.    The Student has Never Attended a "Regular" School Day ....... 5

          C.    The District Developed and Implemented an IEP Containing More Special Education Service Time Than the Kentucky IEP .......................................... 8

          D.    The District and the Parents Continued to Address the Student's School Day and her Unique Needs Through the IEP Process ....................................... 10

          E.    The Student Benefited From The Instruction Provided in Accordance With Her IEPs ................... 14

SUMMARY OF THE ARGUMENT ................................................ 16

ARGUMENT .............................................................................. 18

    I.    STANDARD OF REVIEW.............................................. 18

II.   THE PARENTS' CLAIM FAILS AS A MATTER OF LAW
      BECAUSE THE DISTRICT DID NOT ACT IN BAD FAITH
      OR WITH GROSS MISJUDGMENT ............................................... 19

      A.   The District Court Correctly Identified Bad Faith or
           Gross Misjudgment as Critical Elements of the Parents'
           Discrimination Claims............................................................. 20

      B.   The Bad Faith or Gross Misjudgment Standard Applies
           Regardless of How the Parents Frame Their Claims.............. 22

      C.   There is no Basis for Abandoning the Bad Faith or
           Gross Misjudgment Standard .................................................. 23

      D.   The District did Not Act in Bad Faith or with Gross
           Misjudgment ........................................................................... 29

           1.   The District Acted in Good Faith and within
                Accepted Professional Judgment .................................. 30

           2.   Regardless of Whether the District Complied
                with the IDEA, Following the IDEA Process
                Demonstrates that the District did not Act with
                Bad Faith or Gross Misjudgment ................................... 35

           3.   There is no Per Se Requirement to Provide a
                Regular or Full School Day to any Student .................. 43

III.  THE DISTRICT DID NOT VIOLATE SECTION 504
      UNDER ANY STANDARD ........................................................... 49

      A.   The Legal Standard ................................................................ 49

      B.   The District Did Not Deny the Student Any Benefits of a
           Program or Activity of the District Based on Her Disability... 50

      C.   The District did not Intentionally Discriminate Against
           the Student ............................................................................. 52

CONCLUSION ...................................................................................... 53

CERTIFICATE OF COMPLIANCE .................................................... 55

# TABLE OF AUTHORITIES

**Cases**

*Anda v. Wickes Furniture Co.*, 517 F.3d 526 (8th Cir. 2008) ................................ 19

*Arroyo-Sosa v. Garland*, 74 F.4th 533 (8th Cir. 2023) ......................................... 19

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) ........ 25, 42

*Baker v. Bentonville Sch. Dist.*, No. 22-2669, 2023 WL 4778203
(8th Cir. 2023) ............................................................................................ passim

*Barnwell ex rel. Barnwell v. Watson*, 880 F.3d 998 (8th Cir. 2018) ........... 19, 52-53

*Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850 (8th Cir. 2000) ..................... 18, 29

*B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882
(8th Cir. 2013) ............................................................................................ passim

*Board of Education of Hendrick Hudson Central School District v.
Rowley ex rel. Clifford and Nancy Rowley*, 458 U.S. 176 (1982) ..................... 45

*Bradley v. Arkansas Dep't of Educ.*, 301 F.3d 952 (8th Cir. 2002) ................. 18, 29

*C.B. v. Bd. of Educ. of City of Chicago, Dist. 299*, 624 F. Supp. 3d 898
(N.D. Ill. 2022) ................................................................................................... 27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................... 18

*Christopher M. ex rel. Laveta McA. v. Corpus Christi Indep. Sch. Dist.*,
933 F.2d 1285 (5th Cir. 1991) ............................................................................ 46

*Christopher S. ex rel. Rita S. v. Stanislaus County Office of Education*,
384 F.3d 1205 (9th Cir. 2004) ....................................................................... 46-47

*Coleman v. Prince George's Cnty. Bd. of Educ.*, No. DLB-21-68,
2023 WL 4483594 (D. Md. June 2, 2023) ......................................................... 25

*D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450
(5th Cir. 2010) ............................................................................................... 26-27

*DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102
(8th Cir. 1997) ............................................................................................ passim

*Doe v. Pleasant Valley Sch. Dist.*, 745 F. App'x 658 (8th Cir. 2018)
(unpublished) ............................................................................... 18

*Doe v. Pleasant Valley Sch. Dist.*, No. 315CV00085SMRSBJ,
2017 WL 8792704 (S.D. Iowa Dec. 5, 2017), *aff'd*, 745 F. App'x 658 ............ 28

*Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*,
580 U.S. 386 (2017) ....................................................... 28-29, 35-36

*Firemen's Fund Ins. Co. v. Thein,* 8 F.3d 1307 (8th Cir. 1993) ........................... 32

*Frevert v. Ford Motor Co.*, 614 F.3d 466 (8th Cir. 2010) ................................. 32-33

*Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154 (2017) ............................................ 41

*G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623 (6th Cir. 2013) ................................. 27

*Heidemann v. Rother*, 84 F.3d 1021 (8th Cir. 1996) ...................................... 18, 29

*Hoekstra ex rel. Hoekstra v. Indep. Sch. Dist. No. 283*, 103 F.3d 624
(8th Cir. 1996), *cert. denied,* 520 U.S. 1244 (1997) ....................... 18, 23, 28, 50

*I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Schs.*, 863 F.3d 966
(8th Cir. 2017) ....................................................................... passim

*Kass ex rel. Kass v. W. Dubuque Cmty. Sch. Dist.*, No. C21-1013-LTS-KEM,
2022 WL 16773360 (N.D. Iowa Nov. 3, 2022), appeal docketed,
No. 22-3506 (8th Cir. Dec. 5, 2022) ................................................ 21

*K.E. v. Independent District No. 15*, 647 F.3d 795 (8th Cir. 2011) ....................... 34

*K.K. v. Pittsburgh Public Schools*, 590 F. App'x 148 (3d Cir. 2014)
(unpublished) ............................................................................... 37

*Knox Cnty. v. M.Q.*, 62 F.4th 978 (6th Cir. 2023) ................................................ 26

*L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*,
55 F.4th 1296 (11th Cir. 2022) ......................................................... 26

*Mark H. v. Lemahieu*, 513 F.3d 922 (9th Cir. 2008) ........................................... 37

*Li v. Revere Loc. Sch. Dist.*, No. 21-3422, 2023 WL 3302062
(6th Cir. May 8, 2023) ..................................................................... 25

*Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs.*,
565 F.3d 1232 (10th Cir. 2009) .................................................. 37, 48

*Minnetonka Pub. Sch., v. M.L.K. ex rel. S.K.*, 42 F.4th 847 (8th Cir. 2022) .......... 35

*Monahan ex rel. Monahan v. Nebraska,* 687 F.2d 1164 (8th Cir. 1982),
*cert denied*, 460 U.S. 1012 (1983) ............................................ passim

*M.P. ex rel. K & D.P. v. Indep. Sch. Dist. No. 721*, 326 F.3d 975
(8th Cir. 2003) ............................................................. 38-42

*M.P. ex rel. K & D.P. v. Indep. Sch. Dist. No. 721*, 439 F.3d 865
(8th Cir. 2006) ............................................................. 38-42

*Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735 (2d Cir. 2018) ......................... 26

*M.Y. ex rel. J.Y. v. Special Sch. Dist. No. 1*, 544 F.3d 885 (8th Cir. 2008) ..... passim

*Oakes v. Thurgood Marshall Acad. Pub. Charter High Sch.*,
No. 1:20-CV-02754-DLF, 2022 WL 1556382 (D.D.C. May 17, 2022) ........... 27

*Parrish v. Bentonville Sch. Dist.*, 896 F.3d 889 (8th Cir. 2018) ........................... 18

*Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 859 (2023) ......................................... 24-25

*Piotrowski v. Rocky Point Union Free Sch. Dist.*, No. 18CV6262RPKSIL,
2023 WL 2710341 (E.D.N.Y. Mar. 30, 2023) ................................... 25

*Richardson v. Omaha Sch. Dist.*, 957 F.3d 869 (8th Cir. 2020) ................ 18, 29-30

*Sellers ex rel. Sellers v. Sch. Bd. of the City of Manassas*, 141 F.3d 524
(4th Cir. 1998) ................................................................. 26

*Smith v. Rockwood R-VI Sch. Dist.*, 895 F.3d 566 (8th Cir. 2018) ................... 1, 21

*Sonkowsky ex rel. Sonkowsky v. Bd. of Educ. for Indep. Sch. Dist. No. 721*,
327 F.3d 675 (8th Cir. 2003) ................................................ 18, 23

*Southeastern Community College v. Davis*, 442 U.S. 397 (1979) ........................ 51

*Timms ex rel. Timms v. Metro. Sch. Dist. of Wabash Cnty.*, 722 F.2d 1310
(7th Cir. 1983) ............................................................. 21-22

*Thompson ex rel. Buckhanon v. Bd. of Special Sch. Dist. No. 1*,
144 F.3d 574 (8th Cir. 1998) .......................................................... 18, 23

*Toler v. Reeves*, 991 F.2d 802 (8th Cir. 1993) ...................................... 32

*Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138 (2d Cir. 2002) ............. 47

*White v. McDonnell Douglas Corp.*, 904 F.2d 456 (8th Cir. 1990)...................... 33

**Statutes**

20 U.S.C. § 1415 ................................................................. 12

Ky. Rev. Stat. § 158.070 .......................................................... 8

Minn. Stat. § 120A.05 ............................................................ 45

Minn. Stat. § 120A.22 ........................................................... 9, 45

Minn. Stat. § 120A.41 ............................................................. 5

Minn. Stat. § 125A.091 .......................................................... 10, 12

Minn. Stat. § 123B.09 ............................................................. 5

**Rules**

34 C.F.R. § 104.33 ............................................................. 36, 45

34 C.F.R. § 104.36 ............................................................... 35

34 C.F.R. § 300.320 .............................................................. 42

34 C.F.R. § 300.321 .............................................................. 42

34 C.F.R. § 300.322 ............................................................ 31, 42

34 C.F.R. § 300.323 ............................................................ 31, 42

34 C.F.R. § 300.324 .......................................... 42

34 C.F.R. § 300.518 .......................................... 34

Fed. R. App. P. 28 ........................................... 19

**Other Authorities**

Br. *Amicus Curiae* Parent Attorneys & Advocates, Inc., at 21, I.Z.M.,
    863 F.3d (No. 16-1918), 2016 WL 4055419 ............................. 25-26

*Frequently Asked Questions About Section 504 and the Education of Children
    with Disabilities,* 111 LRP 76408 (OCR 2011) ........................ 37

Perry A. Zirkel, *Do Courts Require a Heightened, Intent Standard
    for Students' Section 504 and ADA Claims Against School Districts?*
    47 J.L. & Educ. 109 (2018) .......................................... 28

# STATEMENT OF THE ISSUES

1.  Whether the District Court correctly held that the Parents can only prevail on their Section 504 and ADA claims if they establish that the District acted with "bad faith" or "gross misjudgment?"

    **Apposite Cases**:

    *Baker v. Bentonville Sch. Dist.*, No. 22-2669, 2023 WL 4778203 (8th Cir. 2023)

    *I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Schs.*, 863 F.3d 966 (8th Cir. 2017)

    *Monahan ex rel. Monahan v. Nebraska*, 687 F.2d 1164 (8th Cir. 1982), *cert denied*, 460 U.S. 1012 (1983)

    *Smith v. Rockwood R-VI Sch. Dist.*, 895 F.3d 566 (8th Cir. 2018)

2.  Whether the District Court correctly held that there is no material question of fact that precluded the entry of summary judgment in the District's favor on the Parents' Section 504 and ADA claims?

    **Apposite Cases:**

    *DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102 (8th Cir. 1997)

    *M.Y. ex rel. J.Y. v. Special Sch. Dist. No. 1*, 544 F.3d 885 (8th Cir. 2008)

    *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882 (8th Cir. 2013)

# STATEMENT OF THE CASE

## I.     PROCEDURAL POSTURE.

This case is an appeal of the District Court's grant of summary judgment, dismissing the Parents' claims that the District discriminated against the Student in violation of Section 504 and the ADA.  It is also a companion to Appellate Case No. 22-3137.  In both cases, the Parents allege that the IEPs the District proposed and implemented violated the Student's rights.  In Case No. 22-3137, the Parents contend that the IEPs failed to provide the Student with a free appropriate public education ("FAPE") in violation of the IDEA because the IEPs provided her 4.25 hours of education each day, not the 6.5 hours that constitutes a typical school day. In this case, the Parents allege that, based on the same facts, that the District discriminated against the Student in violation of Section 504 and the ADA by proposing and implementing those same IEPs.

### A.     Appellate Case No. 22-3137.

The Parents filed a request for an IDEA due process hearing in 2020.[1]  As they do in this case, the Parents argued that the Student is entitled to a "regular" school day, that is to say 6.5 hours of instruction, despite the fact that she cannot attend school before noon due to her medical condition and morning care routine.[2]

---

[1]    Parents.App. 343-48; R. Doc. 33-23.

[2]    *Id.*

In April 2021, the Administrative Law Judge ("ALJ") ruled that the Student had not received a FAPE because her IEPs did not contain sufficient instruction.[3] Instead of the 6.5 hours of instruction sought by the Parents, however, the ALJ ordered the District to amend the Student's IEP to provide a total of 5.75 hours each day, adding an additional 90 minutes of instruction in the Student's home.[4] The District appealed the ALJ's decision to the District Court in June 2021.[5] The Parents did not appeal nor did they file a counterclaim.[6] In September 2022, the District Court erroneously affirmed the ALJ's decision and, in October 2022, the District appealed that decision.[7]

**B.    This Matter.**

The Parents filed the Complaint initiating this lawsuit in August 2021, and subsequently filed an Amended Complaint in November 2021.[8] Relying on the same factual assertions underlying their IDEA due process hearing claims, the

---

[3]   Parents.App. 349-70; R. Doc. 33-24.

[4]   *Id.*

[5]   *See* Docket Report for Case File No. 21-CV-1453 (MJD/DTS) ("IDEA case Docket Report"), Doc. No. 1.

[6]   *See* IDEA case Docket Report; *see also* Parents.App. 1-30; R. Doc. No. 15.

[7]   *See* IDEA case Docket Report.

[8]   App. 1-26; R. Doc. 1; Parents.App. 1-30; R. Doc. 15.  The complaint was amended to include a claim that the District retaliated against the Parents.  The District Court correctly granted the District's summary judgment motion on such claim and the Parents did not appeal that decision.  *See* Parents.App. 716-721; R. Doc. 58, at 36-41.

Complaint alleged that the District violated the IDEA, Section 504, and the ADA by not providing the Student a "regular" school day (6.5 hours of instruction).[9]

In July 2022, the District moved for summary judgment on the Parents' claims.[10] The District Court granted that Motion in an Order, dated February 1, 2023, properly applying this Court's precedent and concluding that the District had not acted with the "bad faith" or "gross misjudgment" necessary for the Parents' to prevail in their Section 504 or ADA claims.[11] In the same Order, the District Court dismissed the Parents' separate retaliation claim and IDEA claim raised in the Complaint.[12] This appeal followed.[13]

## II. STATEMENT OF THE FACTS.

### A. Osseo Area Schools.

The District serves over 20,000 students, approximately 15 percent of whom receive special education services pursuant to the IDEA.[14] As with all Minnesota school districts, the District's School Board sets the operating hours for the

---

[9] App. 17-24; R. Doc. 1, at 17-24; Parents.App. 20-28; R. Doc. 15, at 20-28; *see* Parents.App. 368-69; R. Doc. 33-24, at 20-21.

[10] App. 27-28; R. Doc. 31.

[11] Parents.App. 681-724; R. Doc. 58.

[12] *Id.*

[13] App. 283; R. Doc. 60.

[14] MDE Report Card, available online at: https://rc.education.mn.gov/#demographics/orgId--10279000000__groupType--district__p--f (last viewed Aug. 6, 2023).

District's schools.[15]  In general, District students attend school in person at their assigned school, during the designated school day, unless modified pursuant to the IDEA, Section 504, the Executive Orders related to COVID-19, or other applicable unique circumstance.[16]

The two schools relevant to this case are Cedar Island Elementary School ("Cedar Island") and Maple Grove Middle School ("Maple Grove").  Both schools provide education to students with and without disabilities.[17]  At all relevant times, the typical school day at Cedar Island was 9:30 a.m. to 4:00 p.m.[18] and the typical school day at Maple Grove was 8:10 a.m. to 2:40 p.m.[19]

### B.    The Student has Never Attended a "Regular" School Day.

The Student has severe intractable epilepsy, diagnosed as Lennox-Gastaut Syndrome ("LGS").[20]  LGS causes her to have daily seizures of multiple types.[21] The Student "actively [has] seizures all day every day," which, among other impacts, has affected her memory, attention, and ability to learn."[22]  In light of her

---

[15]  *See* Minn. Stat. §§ 120A.41, 123B.09, subds. 1, 8.

[16]  *See* App. 95; R. Doc. 33, at 56 (221:2-8, 222:4-16, 223:10-18); App. 246; R. Doc. 33-4, at 315 (728:1-25, 729:1-8).

[17]  *See generally* Parents.App. 95; R. Doc. 33, at 56 (221:9-25, 222:1-3).

[18]  App. 129; R. Doc. 33-11, at 2 (¶ 12); Parents.App 240; R. Doc. 33-4, at 309 (705:10-19).

[19]  Parents.App. 95, 104; R. Doc. 33, at 56, 65 (221:11-12, 257:12-13).

[20]  App. 54; R. Doc. 33-4, at 95 (255:2-7); *see also* Parents.App. 280; 33-5, at 5 (11-12); App. 83; R. Doc. 33-6, at 1.

[21]  App. 78; R. Doc. 33-4, at 434 (951).

[22]  App. 64; R. Doc. 34-4, at 201 (534:18-23).

seizure activity, as pediatric neuropsychologist Dr. Karen Wills testified in the due

process hearing, both the Parents and the District "are intensely striving to provide

for her growth and development."[23]

Developmentally, the Student functions much like an 18-month-old child.[24]

She is mostly nonverbal but—inconsistently—communicates through her own

signs.[25] She requires assistance with walking and toileting, among other tasks.[26]

The Student's medical needs have long prevented her from receiving

instruction in the morning.[27] For instance, she attended an early intervention

program at Cincinnati Children's Hospital's Aaron W. Perlman Center ("Perlman

Center") when she was two or three years old.[28] The program's hours were 9:30

a.m. to 11:00 a.m.[29] After several months, it was determined that the Student was

unable to attend the program during its hours because of her seizures.[30] The

---

[23] App. 61; R. Doc. 33-4, at 195 (511:19-24).

[24] App. 78; R. Doc. 33-4, at 434 (954:15).

[25] App. 50-51; 33-4, at 10-11 (40:24-25) ; Parents.App. 221; R. Doc. 33-4, at 11 (41:1-3).

[26] App. 128-130; R. Doc. 33-11, at 1-3.

[27] *See* Parents.App. 172; R. Doc. 33-2 (52:1-2); App. 129; R. Doc. 33-11 (¶12); App. 131-32; R. Doc. 33-12; App. 133; R. Doc. 33-13.

[28] App. 48; R. Doc. 33-4, at 7 (28:15-18).

[29] App. 48; R. Doc. 33-4, at 7 (28:23-24); *see also* Parents.App. 167; R. Doc. 33-2, at 10 (31:10-15).

[30] App. 49; R. Doc. 33-4, at 8 (29:8-13); *see also* Parents.App. 167, 173; R. Doc. 33-2, at 10, 16 (31:10-15, 55:7-10).

Perlman Center did not offer services in the afternoon, so the Student stopped attending.[31]

Before enrolling in the District, the Student attended Longbranch Elementary School ("Longbranch") in the Boone County Kentucky School District ("Kentucky District").[32]  When the Student was enrolled in the Kentucky District, the Longbranch school day was 8:40 a.m. to 3:40 p.m. (7 hours).[33]  The Student, however, never attended the regular school day at Longbranch.[34]  Instead, upon parental request to manage her seizure activity and recovery, the Student attended Longbranch on a shortened school day basis—noon until approximately 3:30 or 4:00 p.m.—from the 2011-2012 school year until she left the Kentucky District.[35]  The Student also received in-home paraprofessional support from the Kentucky District three days per week from 4:30 p.m. until 6:00 p.m.[36], [37]  As required by Kentucky law, and unrelated to IDEA's obligations, the Student further received

---

[31]  Parents.App. 173; R. Doc. 33-2, at 16 (55:11-16).
[32]  Parents.App. 172; R. Doc. 33-2, at 15 (52-53).
[33]  *See* Parents.App. 302-04; R. Doc. 33-7, at 1-3.
[34]  Parents.App. 173, 175; R. Doc. 33-2, at 16, 18 (56:19-21; 65:4-15).
[35]  Parents.App. 302-04; R. Doc. 33-7; *see also* Parents.App. 173, 175; R. Doc. 33-2, at 16, 18 (56:19-21; 65:1-25); Parents.App. 235-36; R. Doc. 33-4, at 25-26 (98-101).
[36]  Parents.App. 241; R. Doc. 33-4, at 310 (708:19-22).
[37]  The Parents reported that the Kentucky IEP was incorrect where it stated that the Student received in-home services five days a week. Parents.App. 241; R. Doc. 33-4, at 310 (709:6-16).

after-school, in-home services twice a week from the State of Kentucky via a Medicaid waiver.[38]

Even so, and, as the Parents admitted, the Student received less instructional time than did her nondisabled peers at Longbranch.[39] Instead, she received, at most five hours and 45 minutes of instruction a day, while her nondisabled peers at Longbranch were in school for seven hours.[40] The Student's shortened school day and evening services from the Kentucky District were reflected in the IEPs developed by the Kentucky District ("Kentucky IEP").[41]

### C. The District Developed and Implemented an IEP Containing More Special Education Service Time Than the Kentucky IEP.

The Student enrolled in the District in October 2015.[42] As they had in Longbranch, the Parents requested that the Student begin school at noon each day to accommodate the Student's seizure activity.[43] Specifically, the Parents provided a letter from the Student's treating neurologist, stating that her "school schedule [needed to] be modified" to have the Student "not attend school before noon" due

---

[38] Parents.App. 177; R. Doc. 33-2, at 20 (72:15-21); App. 57; R. Doc. 33-4, at 108 (307:6-10, 309:6-12); *see* Parents.App. 176; R. Doc. 33-2, at 19 (67-68); *see also* Ky. Rev. Stat. § 158.070.

[39] Parents.App. 178; R. Doc. 33-2, at 18, 21 (62:3-10, 76:5-15, 77:10-17).

[40] *Id.*

[41] Parents.App. 174-78; R. Doc. 33-2, at 17-21 (61:17-19, 65-75); Parents.App. 305-18; R. Doc. 33-8.

[42] App. 46; R. Doc. 33-4, at 5 (20:16-17); Parents.App. 319-21; R. Doc. 33-9; Parents.App. 322; R. Doc. 33-10, at 1.

"to morning seizure frequency and intensity."[44]  As permitted by Minnesota law,[45] the District granted that request and always excused the Student until noon.[46]  At all times, however, the District offered to educate the Student before noon, if she was able to attend on any particular day.[47]

The Parents provided the District a copy of the Student's Kentucky IEP at the time she enrolled in the District.[48]  Before the Student moved to Minnesota, and within days of enrollment, the District convened multiple IEP team meetings to discuss her educational needs.[49]  The Parents asked the District for paraprofessional support at home from 4:00 p.m. to 6:00 p.m. each school day.[50]  The District denied that request, instead offering an IEP that had the Student beginning school at noon, but containing 240 minutes of direct special education daily and 20 minutes weekly of direct speech services in school, compared to the

---

[43]  App. 129; R. Doc. 33-11, at 2 (¶ 10).
[44]  App. 131; R. Doc. 33-12, at 1.
[45]  Minn. Stat. § 120A.22, subd. 12.
[46]  App. 129; R. Doc. 33-11, at 2 (¶¶ 10, 11); App. 136; R. Doc. 33-15, at 2 (stating that the Student "can not [sic] come to school in the morning due to her seizure activity through the night and in the morning").
[47]  Parents.App. 246; R. Doc. 33-4, at 315 (728-29); App. 72; R. Doc. 33-4, at 348 (859-60).
[48]  App. 46; R. Doc. 33-4, at 5 (20:16-17); Parents.App. 319-21; R. Doc. 33-9.
[49]  App. 47, 52; R. Doc. 33-4, at 6, 41 (21: 20-23; 23:5-9); Parents.App. 241-42 (708:10-12; 712:2-7); R. Doc. 33-4, at 310-11 (162:23-25, 163:1-7;); *See also* Parents.App. 172; R. Doc. 33-2, at 15 (52:19-25, 53:1-11); Parents.App. 319; R. Doc. 33-9, at 1.
[50]  App. 136; R. Doc. 33-15, at 2.

125 minutes of daily special education services contained in the Kentucky IEP.[51]

On October 20, 2015, the Parents signed the IDEA-required parental

consent/objection, consenting to elements of the proposed IEP but objecting to the

denial of their request for in-home, evening services.[52]  The Student began

attending Cedar Island under this agreement in October 2015.[53]  She has

consistently received education pursuant to an IEP ever since.[54]

### D. The District and the Parents Continued to Address the Student's School Day and her Unique Needs Through the IEP Process.

The Student's IEP team repeatedly met to discuss not only the Parents'

ongoing request for evening services at home, but many other aspects of her

education.[55]  Per Minnesota's law, the District also offered mediation and

facilitated IEP team meetings to try to resolve the Parents' disputes, but the Parents

never accepted these offers.[56]

---

[51]  Parents.App. 241; R. Doc. 33-4, at 310; Parents.App. 330; R. Doc. 33-10, at 9.

[52]  Parents.App. 319-321; R. Doc. 33-9; App. 135-137; R. Doc. 33-15, at 1-3.

[53]  App. 47, 52; R. Doc. 33-4, at 6, 41 (22:25, 23:1-9; 162:19-25, 163:1-7).

[54]  *See, e.g.*, Parents.App. 213-220; R. Doc. 33-3; Parents.App. 322-330; R. Doc. 33-10; App. 146-160; R. Doc. 33-20; App. 161-179; R. Doc. 33-25; App. 248-265; R. Doc. 33-30; App. 266-282; R. Doc. 33-31.

[55]  Parents.App. 24; R. Doc. 33-2 (90:17-18); Parents.App. 221; R. Doc. 33-4 (42-43); App. 129; R. Doc. 33-11, at 2 (¶ 13); *see* App. 135-137; R. Doc. 33-15; App. 138-141; R. Doc. 33-16; App. 142-143; R. Doc. 33-17.

[56]  Parents.App. 97; R. Doc. 33, at 58 (229-30); Parents.App. 338-39; R. Doc. 33-22, at 1-2 (77-78); *see generally* Minn. Stat. § 125A.091.

For instance, at the time she enrolled in the District, the school day at Cedar Island was from 9:30 a.m. to 4:00 p.m.[57]  The Student attended from noon to 4:00 p.m.; however, her mother initially picked the Student up from school at 3:30 p.m.[58]  In response to the Student's mother's choice to pick up the Student 30 minutes early, in March 2016, the District sent the Parents a Prior Written Notice ("PWN") addressing the Student's school day.[59]  In that PWN, the District addressed the Parent's ongoing request for a longer school day, proposing to provide instruction "beyond the end of the regular school day" until 4:15 p.m., including additional one-to-one services with her special education teacher.[60]  The Parents accepted that proposal.[61]

In spring 2017, the District again proposed an IEP containing 4.25 hours of special education instruction—from noon until 4:15 p.m.—again including services beyond the end of the typical Cedar Island school day.[62]  The Parents did not object to the proposed IEP within 14 days of receipt of the proposal.[63]

---

[57]  Parents.App. 240; R. Doc. 33-4, at 309 (705:14-15).
[58]  Parents.App. 240; R. Doc. 33-4, at 309 (705-706).
[59]  App. 138-41; R. Doc. 33-16, at 1-4.
[60]  *Id.*
[61]  App. 53; R. Doc. 33-4, at 47 (185:25, 186:1-18); Parents.App. 240-241; R. Doc. 33-4, at 309-10 (706:25, 707:1-18).
[62]  App. 144-145; R. Doc. 33-19, at 1-2.
[63]  Parents.App. 242; R. Doc. 33-4, at 311 (713:9-23); App. 145; R. Doc. 33-19, at 2.

Accordingly, the 2017 IEP went into effect pursuant to Minnesota law.[64]  The 2017 IEP was the last agreed upon, or "stay-put," IEP, which the District was required to implement.[65]  As they had before, the Parents again were provided their Notice of Procedural Safeguards in accordance with IDEA and Minnesota law.[66]

In April 2018, in preparation for the Student's transition to Maple Grove, the IEP team discussed the Student's school day in middle school.[67]  Maple Grove's typical school day ends at 2:40 p.m., and the IEP team initially proposed an IEP starting at noon, and providing educational services until 3:00 p.m. (20 minutes beyond the end of the typical school day).[68, 69]  The Parents rejected that proposal and, therefore, it never went into effect.[70]  In response, *the Parents* proposed "hours of instruction similar to those currently provided" at Cedar Island; from noon until 4:15 p.m.[71]  The District continued to be educated from noon to 4:15 p.m.—well after Maple Grove's regular school day concluded—under her stay-put

---

[64]  *Id.*; *see* Parents.App. 242; R. Doc. 33-4, at 311 (713:13-23); *see also* Minn. Stat. § 125A.091, subd. 3a.

[65]  The IDEA requires that, during the pendency of any dispute between a parent and school district, the student must remain in the then-current educational placement as outlined on that IEP, which is commonly referred to as the "stay-put IEP."  *See* 20 U.S.C. § 1415(j).

[66]  *See, e.g.*, Parents.App. 322; R. Doc. 33-10, at 1; App. 143; R. Doc. 33-17, at 2.

[67]  Parents.App. 335-36; R. Doc. 33-21, at 1-2.

[68]  Parents.App. 335-37; R. Doc. 33-21, at 1-3.

[69]  The Student was retained at Cedar Island for two years at the request of her Parents and the School District accommodated this request.  *See* App. 53; R. Doc. 33-4, at 47 (185).

[70]  *Id.*; *see generally* Minn. Stat. § 125A.091, subd. 3a(1).

IEP.[72]  No other District student received similar educational services from the District after the end of the school day.[73]

The Student receives very intensive special education services.[74]  Unlike a regular education student or even most students receiving special education services, the Student always received the undivided attention of one or more adults who worked with her on her goals and objectives during the regular school day.[75] After the school day, the Student received direct one-to-one special education services from a licensed special education teacher along with additional support from a one-to-one paraprofessional.[76]

Pursuant to her IEPs, the District also provided the Student extended school year ("ESY") services each summer.[77]  The District typically provides ESY at a school from 9:00 a.m. to 12:00 p.m.[78]  Due to her inability to attend school before noon, however, the District provided the Student's ESY services in her home from

---

[71]  *See* Parents.App. 341; R. Doc. 33-22, at 4.

[72]  Parents.App. 184; R. Doc. 33-2, at 27 (100:15-24).

[73]  *See* App. 80, 94-95, 105; Doc. R. 33, at, 41, 55-56, 66 (164:4-6; 220:5-9, 221-22; 262:22-25).

[74]  Parents.App. 272; R. Doc. 33-4, at 451 (1019:13-25).

[75]  Parents.App. 258, 262, 272; R. Doc. 33-4, at 327, 331, 451 (778:17-19, 793:15-18, 1019:17-18, 1020:2-25, 1021:1-11).  One-to-one service is intensive. Parents.App. 58; R. Doc. 33-4, at 115 (337:13-18).

[76]  Parents.App. 94; R. Doc. 30 (218:24-25, 219:1-6); Parents.App. 272; R. Doc. 33-4, at 451 (1020:2-25, 1021:1-11).

[77]  Parents.App. 246, 256-57; R. Doc. 33-4, at 315, 325-26 (727:9-25; 770-771); *see also* Parents.App. 219-220; R. Doc. 33-3, at p. 7-8; Parents.App. 330; R. Doc. 33-10, at 9; App. 177; R. Doc. 33-25, at 17; App. 248-265; R. Doc. 33-30.

12:00 p.m. to 3:00 p.m.[79]  For the 2018-19 school year, in addition to the ESY services, the District also offered to provide additional instruction in June and August, which the Parents rejected.[80]

### E.    The Student Benefited From Her Instruction.

Despite the high likelihood of regression, due to her seizure disorder, the Student did not regress during her time at District, as Dr. Wills testified.[81]  Instead, despite her "significant disabilities" inhibiting more than "very small" "increments of . . . progress" as the Student's treating neurologist Dr. Galen Breningstall opined,[82] the Student made significant progress in many areas, including functional skills such as her ability to feed herself.[83]

The Parents' expert, Dr. Reichle, acknowledged that the Student made gains on the skills she was learning in school.[84]  Indeed, even the ALJ recognized that the Student made progress in several skills.[85]

---

[78]   *See* Parents.App. 257; R. Doc. 33-4, at 326 (771:2-12).
[79]   Parents.App. 246, 256-57; R. Doc. 33-4, at 315, 325-26 (727:9-25; 770-771).
[80]   Parents.App. 331; R. Doc. 33-18, at 1; Parents.App. 246-47; R. Doc. 33-4, at 315-16 (730:18-25, 731:1-8).
[81]   App. 62, 65, 74; R. Doc. 33-4, at 197, 207, 356 (518-519; 556:12-20, 557:8-13, 892:2-8, 893:6-11); Parents.App. 261-62; R. Doc. 33-4, at 330-31 (789:16-18, 793-94).
[82]   App. 56; R. Doc. 33-4, at 103 (289: 22-25, 290:1-5).
[83]   App. 62, 65, 74; R. Doc. 33-4, at 197, 207, 356 (518-519; 556:12-20, 557:8-13, 892:2-8, 893:6-11); Parents.App. 261-62; R. Doc. 33-4, at 330-31 (789:16-18, 793-94).
[84]   App. 60, 66, 69; R. Doc. 33-4, at 149, 214, 234 (473:16-17; 584:5-15; 666:6-9).
[85]   Parents.App. 358; R. Doc. 33-24, at 10 (¶¶ 58, 61).

For instance, the Student made progress at Cedar Island.[86]  As her special education teacher at Cedar Island Ms. Pam Kohlhepp testified, the Student made progress in her communication ability, including "a lot of gains in terms of her desire to communicate" and her intent to communicate.[87]  The Student also made "a good deal of progress" in using eye gaze to answer questions or select choices.[88]

The Student's progress continued at Maple Grove.  For instance, the Student's special education teacher at Maple Grove, Teresa Elliott, testified that she "absolutely" made progress with communicating choices, gaining adult attention, moving objects, literacy, and math.[89]  As Dr. Wills testified, the Student also made "a distinct improvement" in many functional skills, including visual tracking, responding to what was going on around her, initiating and sustaining some turn-taking play, expanding her use of the eye-gaze technology, being more independent with her signs, and responding to basic instructions.[90]  The Student's progress at Maple Grove extended to numerous objectives on her IEP goals.[91]

---

[86]   App. 70; R. Doc. 33-4, at 340 (829-30).
[87]   *Id.*
[88]   App. 70; R. Doc. 33-4, at 353 (882:16-18).
[89]   App. 73; R. Doc. 33-4, at 446-49 (999-1011).
[90]   App. 79-82; R. Doc. 33-4, at 197-198 (519:11-25, 520:1-4).
[91]   App. 62-63; R. Doc. 33-4, at 365-66, 446-48 (930-32; 999-1010).  The data collected by Maple Grove included "a rich amount of data from which to calculate progress."  App. 76; R. Doc. 33-4, at 366 (932:4-8).

# SUMMARY OF THE ARGUMENT

The Parents claim that the District violated Section 504 and the ADA by providing the Student 4.25 hours of instruction, instead of a "full" or "regular" 6.5-hour school day. The Parents' claims are inextricably intertwined with the special education services provided by the District. The length of the Student's school day is expressly identified in the Student's IEPs and PWNs. The Parents initiated an IDEA due process hearing on the same issue, and their Complaint included an IDEA claim based on the same factual assertions as their Section 504 and ADA claims.

As the Parents' claims are premised on the provision of educational services, decades of precedent from this Court require the Parents to demonstrate that the District's actions were made in "bad faith" or with "gross misjudgment." Despite the Parents' contentions, and those of the Council of Parent Attorneys and Advocates ("COPAA"), that standard remains good law and there is no reason for this Court to abandon that standard or disregard it in this case.

There is no question of material fact requiring a trial. There is still no evidence to support their assertion that the District's actions fell outside of the bounds of accepted professional judgment, which is fatal to their claims. Multiple highly respected experts concluded that the District acted appropriately. Even the Parents' experts did not opine that the District acted in bad faith or with gross

misjudgment and, in fact, agreed with some of the actions taken by the District.  In the absence of evidence of bad faith or gross misjudgment, all other facts are immaterial and, therefore, summary judgment was appropriate.

To the extent that the Parents allege that the District should have followed the procedural steps of Section 504 or the ADA, the District's adherence to the IDEA's procedures satisfied their obligation under Section 504 and the ADA.  The District repeatedly held IEP team meetings—which include the Parents—to discuss the Parents' concerns and requests for more instructional time.  The District proposed changes to the Student's IEP based upon those discussions and offered alternative dispute resolution under the IDEA when it became clear full agreement would be difficult to reach.

Procedure aside, the District provided the Student intensive, indisputably progress-producing special education services from when she was physically able to attend school beyond the end of the typical school day.  The District did not exclude her from attending school, refuse to excuse her absences, or otherwise deny her the benefits of its educational programs on the basis of her disability.  Accordingly, it is unnecessary to reach the question of whether the District acted with bad faith or gross misjudgment.  Under any standard, the District did not discriminate against the Student.  For all these reasons, this Court should affirm the District Court's Order granting the District's Motion for Summary Judgment.

# ARGUMENT[92]

## I.    STANDARD OF REVIEW.

The summary judgment procedure is an "integral part of the Federal Rules," including for Section 504 and ADA claims based on educational services. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Baker*, 2023 WL 4778203 at *4; *Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 878-79 (8th Cir. 2020); *Parrish v. Bentonville Sch. Dist.*, 896 F.3d 889, 895 (8th Cir. 2018); *I.Z.M.*, 863 F.3d at 972-73; *M.Y.*, 544 F.3d at 889-90 (same); *B.M.*, 732 F.3d at 886-90; *Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856-57 (8th Cir. 2000); *Bradley v. Arkansas Dep't of Educ.*, 301 F.3d 952, 956 (8th Cir. 2002); *Doe v. Pleasant Valley Sch. Dist.*, 745 F. App'x 658 (8th Cir. 2018) (unpublished); *Thompson ex rel. Buckhanon v. Bd. of Special Sch. Dist. No. 1*, 144 F.3d 574, 580 (8th Cir. 1998); *Hoekstra ex rel. Hoekstra v. Indep. Sch. Dist. No. 283*, 103 F.3d 624, 627, 626-27, 626 n.3 (8th Cir. 1996), *cert. denied*, 520 U.S. 1244 (1997); *Heidemann v. Rother*, 84 F.3d 1021, 1030-32 (8th Cir. 1996); *Monahan*, 687 F.2d at 1170-71; *Sonkowsky ex rel. Sonkowsky v. Bd. of Educ. for Indep. Sch. Dist. No. 721*, 327 F.3d 675, 678 (8th Cir. 2003); *DeBord*, 126 F.3d at 1106.

---

[92] The District only addresses the issues raised by the Parents on appeal.  As the Parents did not appeal the District Court's dismissal of their retaliation claim or IDEA claims and did not address them in their principal brief, the Parents have waived any argument they could have made with respect to those issues.  *See, e.g.,*

To "defeat summary judgment," the Parents were "required to present affirmative evidence, not simply contend that a jury might disbelieve the [District's] evidence." *Barnwell ex rel. Barnwell v. Watson*, 880 F.3d 998, 1006 (8th Cir. 2018). This burden is unmet by "mere allegation or denials" or "merely point[ing] to unsupported self-serving allegations." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quotation omitted).

## II. THE DISTRICT DID NOT ACT IN BAD FAITH OR WITH GROSS MISJUDGMENT.

A key element of discrimination claims arising out of the educational services provided to students with disabilities is a showing that the District acted in "bad faith" or with "gross misjudgment." *I.Z.M.*, 863 F.3d at 973.[93] As the District Court correctly held, there is no question of material fact on this issue: the District did not act in bad faith or with gross misjudgment.[94] Absent evidence of bad faith or gross misjudgment, the Parents' claims fail as a matter of law. *I.Z.M.*, 863 F.3d at 973. Therefore, the District Court properly granted the District's Motion for Summary Judgment.

---

*Arroyo-Sosa v. Garland*, 74 F.4th 533, 540 (8th Cir. 2023); *see also* Fed. R. App. P. 28(a)(5)-(8).

[93] Although the Parents allege violations of both Section 504 and the ADA, the claims are interchangeable as the "the enforcement, remedies, and rights are the same under both Title II of the ADA and § 504." *B.M.*, 732 F.3d at 887; *see also DeBord*, 126 F.3d at 1105.

[94] Parents.App. 701-715; R. Doc. 58, at 21-35.

### A. The District Court Correctly Identified Bad Faith or Gross Misjudgment as Critical Elements of the Parents' Discrimination Claims.

The Parents and the COPAA assert that the Parents were not—or should not have been—required to prove that the District acted with bad faith or gross misjudgment.[95] Those contentions are without merit. Indeed, as this Court recently and expressly informed the Parents' attorney and the COPAA, this Court "consistently h[olds] that where alleged ADA and § 504 violations are based on educational services for disabled children, the plaintiff must prove that school officials acted in bad faith or with gross misjudgment." *See, e.g.*, *I.Z.M.*, 863 F.3d at 973. In fact, this standard was first adopted in a case addressing a claim based on IDEA services. *Monahan*, 687 F.2d at 1170. There is neither a legal basis nor a policy reason to deviate from decades of precedent.

Attempting to distinguish *Monahan*, *I.Z.M.*, and the long line of cases involving disputes about educational services—and despite arguing to the contrary in the IDEA due process hearing and their Complaint—the Parents assert their discrimination claims "are *not* based on [the Student's] educational services but on her limited school day."[96] This is a distinction without substance. The heart of the Parents' claim is—and always has been—a challenge to the District's IEPs,

---

[95] *See, e.g.*, Br. Appellant, at 27; Br. Parent Advocates, at 6.
[96] Br. Appellant, at 34.

containing the modified school day in question.[97]  Such claim is, undoubtably a claim about IDEA services.  If nothing else, the fact that the Parents previously filed a due process complaint alleging the denial of FAPE and the Complaint included allegations of IDEA violations based on the same allegations as their Section 504 and ADA claims conclusively "lead[] to the determination that the . . . claims concern the denial of a public education" under the IDEA.  *See Smith*, 895 F.3d at 569; *see also Kass ex rel. Kass v. W. Dubuque Cmty. Sch. Dist.*, No. C21-1013-LTS-KEM, 2022 WL 16773360, at *1, *6, *24-*28 (N.D. Iowa Nov. 3, 2022), appeal docketed, No. 22-3506 (8th Cir. Dec. 5, 2022).

The Seventh Circuit's decision in *Timms ex rel. Timms v. Metropolitan School District of Wabash County*, 722 F.2d 1310 (7th Cir. 1983), is also instructive.  In that case, the parents asserted a Section 504 claim alleging that an IDEA-eligible student was "excluded" from "hours per day of instruction to which they claim she was entitled."  *Timms*, 722 F.2d at 1318.  The Seventh Circuit concluded that the claim was about the IDEA services, as a "central issue" of that claim is "the appropriateness of the program" under the IDEA.  *Id.* at 1318, 1318 n.4.

Like the parents in *Timms*, the Parents allege that the District "excluded" the Student from school based on the length of the school day contained in her IEP.

---

[97] *See, e.g.*, Br. Appellant, at 27; Br. Parent Advocates, at 6.

*Compare Timms*, 722 F.2d at 1318 *with* Br. Appellant, at 32, 34. Therefore, as in

*Timms*, the central issue in this case is the appropriateness of the Student's IEP.

*See Timms*, 722 F.2d at 1318, 1318 n.4.

Despite their attempts to rebrand their IDEA claims as discrimination

claims, the District Court correctly applied the bad faith or gross misjudgment

standard to the Parents' claims. As this Court concluded in *Monahan*, after the

Parents' claims of IDEA violations "are laid to one side, nothing of substance in

the way of allegations of fact remains, certainly nothing that could be said to

amount to a charge of 'discrimination' against [the Student]." 687 F.2d at 1171.

In an attempt to escape this conclusion, the Parents and the COPAA cite to

numerous cases arising in contexts other than challenges to educational services.[98]

As the Parents' Section 504 and ADA claims are undoubtably about educational

services, all of those cases are inapposite and should be entirely disregarded in

light of this Court's longstanding, well-reasoned precedent. *See I.Z.M.*, 863 F.3d at

973, 973 n.6.

**B.      The Bad Faith or Gross Misjudgment Standard Applies
         Regardless of How the Parents Frame Their Claims.**

Regardless of how they describe their arguments, bad faith or gross

misjudgment is still a central element of the Parents' Section 504 and ADA claims.

For instance, this Court applies the bad faith or gross misjudgment standard to

Section 504 claims alleging—as the Parents do—a failure to accommodate students with disabilities and other arguments unrelated to the provision of a FAPE under the IDEA.  *See, e.g.*, *Baker*, 2023 WL 4778203 at *3-*4 (failure to accommodate and disregard of parental concerns); *Hoekstra*, 103 F.3d at 627, 626-27, 626 n.3 (elevator access unrelated to IDEA's FAPE obligation).

In *M.Y.*, this Court held that even if a failure to accommodate claim can constitute discrimination under Section 504 or the ADA, the bad faith or gross misjudgment standard applies.  544 F.3d at 889-90.  This Court has likewise held that the standard applies to allegations based on a school district's failure to alter its policies to accommodate a student with a disability.  *Thompson*, 144 F.3d at 580.  The Court also applies the bad faith or gross misjudgment standard to claims alleging that a school district excludes a student from its programs in violation of Section 504.  *See Sonkowsky*, 327 F.3d at 678 ("exclu[sion] from the field trip to the Vikings arena").  In short, the only standard potentially applicable to the Parents' claims is bad faith or gross misjudgment.

### C.     There is no Basis for Abandoning the Bad Faith or Gross Misjudgment Standard.

In addition to arguing that the bad faith or gross misjudgment standard does not apply to their claims, the Parents and the COPAA argue that the Court should abandon its well-settled precedent and adopt a lower intent standard, or even

---

[98] *See, e.g.*, Br. Appellant, at 26, 33-34, 47-50; Br. Parent Advocates, at 6-12.

disregard the intent standard altogether.[99]  Those contentions are without legal merit or basis in policy.

To begin with, as discussed above, this Court has repeatedly applied the bad faith or gross misjudgment standard to claims such as those brought by the Parents. *See, e.g., I.Z.M.*, 863 F.3d at 973.  Therefore, "even if [this reviewing panel] were inclined to revisit [the standard], as a panel [it is] bound by this controlling precedent." *Id.*

In an argument that is, at best, misplaced, and, at worst, frivolous, the COPAA argues that the bad faith or gross misjudgment standard was "superseded by *Perez" v. Sturgis Pub. Schs.*, 143 S. Ct. 859 (2023), a Supreme Court case addressing the IDEA's exhaustion requirement. [100]  *Perez*, 143 S. Ct. at 862, 865-66 (*explicitly* holding that the decision only addressed IDEA's exhaustion requirement).  The COPAA raises this argument despite its admission that *Perez* "decided a question different than that presented in this case."[101]  Quite simply, as even the Parents acknowledge, *Perez* did not address, much less supersede, any standard of liability.[102]

---

[99] *See* Br. Appellants, at 35-36; Br. Parent Advocates, at 4-13.
[100] Br. Parent Advocates, at 4-9.
[101] *Id.*
[102] *See* Br. Appellants, at 36 (acknowledging that the "Parents recognize that the panel is bound by controlling precedent but urge this Court to revisit *Monahan*").

In addition, on July 27, 2023, after the *Perez* decision, this Court reaffirmed bad faith or with gross misjudgment as the appropriate standard for Section 504 and ADA claims based on educational services. *Baker*, 2023 WL 4778203, at *3. Likewise, the Sixth Circuit and every other court to consider the bad faith or gross misjudgment standard since *Perez*, have concluded that *Perez* did not supersede that standard. *See, e.g.*, *Li v. Revere Loc. Sch. Dist.*, No. 21-3422, 2023 WL 3302062, at *13 (6th Cir. May 8, 2023) (unpublished) (holding that, even if compensatory damages are "exempt from the IDEA's exhaustion requirements under *Perez*," parents still must prove "bad faith or gross misjudgment"); *Coleman v. Prince George's Cnty. Bd. of Educ.*, No. DLB-21-68, 2023 WL 4483594, at *3 (D. Md. June 2, 2023); *Piotrowski v. Rocky Point Union Free Sch. Dist.*, No. 18CV6262RPKSIL, 2023 WL 2710341, at *7 (E.D.N.Y. Mar. 30, 2023). The courts' universal rejection of the argument now raised by the COPAA was inevitable, as the Supreme Court has long taken a "textualist approach to IDEA." *See, e.g.*, *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Thus, there is no basis to conclude that the Supreme Court's analysis of the text of the IDEA applies to any question of liability arising out of any other statute. Tellingly, the COPAA made the same textualist argument, which this Court rejected, in *I.Z.M.*[103]

---

[103] *Compare* Br. *Amicus Curiae* Parent Attorneys & Advocates, Inc, at 21, *I.Z.M.*,

The bad faith and gross misjudgment standard is derived directly from the text of Section 504. By "limiting liability to discrimination 'solely by reason of . . . handicap,' Congress did not intend to create general tort liability for reasonable decisions made by professionals in the educational context." *M.Y.*, 544 F.3d at 890 (quoting *Monahan*, 687 F.2d at 1170-71). The language of Section 504 has not changed since *Monahan*. There is no basis upon which to deviate from the Court's long-standing, well-reasoned interpretation of the express language in Section 504 to create a different liability standard.

The Parents' and the COPAA's citation to out-of-circuit cases that did "not reach" the liability standard for Section 504 and ADA claims does not affect this analysis. *See Knox Cnty. v. M.Q.*, 62 F.4th 978, 1002 (6th Cir. 2023); *L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1304 (11th Cir. 2022). In fact, this Court is far from alone in applying the bad faith or gross misjudgment standard to Section 504 and ADA claims arising in the educational context. *See I.Z.M.*, 863 F.3d at 973, 973 n.6 (collecting cases). The Second, Fourth, Fifth, and Sixth Circuits, along with several district courts, have expressly adopted that standard. *See, e.g., Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 740 n.3 (2d Cir. 2018); *Sellers ex rel. Sellers v. Sch. Bd. of the City of Manassas*, 141 F.3d 524, 529 (4th Cir. 1998); *D.A. ex rel. Latasha A. v. Houston Indep. Sch.*

863 F.3d (No. 16-1918), 2016 WL 4055419 ("*I.Z.M.* Br. Parent Advocates"), *with*

*Dist.*, 629 F.3d 450, 455 (5th Cir. 2010); *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 635 (6th Cir. 2013); *C.B. v. Bd. of Educ. of City of Chicago, Dist. 299*, 624 F. Supp. 3d 898, 918-20, 919 n.10 (N.D. Ill. 2022); *Oakes v. Thurgood Marshall Acad. Pub. Charter High Sch.*, No. 1:20-CV-02754-DLF, 2022 WL 1556382, at *5 (D.D.C. May 17, 2022).

Finally, applying the bad faith or gross misjudgment standard to Section 504 and ADA claims based on educational services "reflects . . . a proper balance between the rights of handicapped children, the responsibilities of state educational officials, and the competence of courts to make judgments in technical fields." *Monahan*, 687 F.2d at 1171. That standard properly balances Section 504's prohibition of disability discrimination and IDEA's FAPE obligation, educators' responsibility of providing educational services with the appropriate services being "often necessarily an arguable matter," and the Supreme Court's "warn[ing]" that a court should not "substitute[e] . . . its own judgment for educational decisions made by state officials." *Id.* at 1170-71.

To counter this Court's and other circuits' well-reasoned analysis, the Parents and the COPAA place great weight on "academic advocacy" by a law school student[104] and Professor Mark Weber.[105] That advocacy effort has been

---

Br. Parent Advocates, at 4, 6.
[104] *See* Br. Appellant, at 38, 42; *see also* Parents.App. 838, 846

widely-rejected. *See, e.g., Doe v. Pleasant Valley Sch. Dist.*, No. 315CV00085SMRSBJ, 2017 WL 8792704, at *3 (S.D. Iowa Dec. 5, 2017), *aff'd*, 745 F. App'x 658 (rejecting argument based on Weber's advocacy). Indeed, "as a matter of objective analysis," courts across the nation, including this Court, continue to impose "a heightened, intent standard for student § 504/ADA claims against school districts." Perry A. Zirkel, *Do Courts Require a Heightened, Intent Standard for Students' Section 504 and ADA Claims Against School Districts?* 47 J.L. & Educ. 109, 115-16 (2018).

The underlying policy considerations have not changed since *Monahan* was decided and, consequently, the application of the bad faith and gross misjudgment standard remains appropriate. *See, e.g., Hoekstra*, 103 F.3d at 627 (holding that the "reasoning behind" the bad faith and gross misjudgment standard is still "appropriate"). In fact, this case highlights the continuing appropriateness of the considerations underlying the adoption of the bad faith or gross misjudgment standard. As the central dispute in this matter is the length of the Student's school day, as contained in her IEP, this case directly requires the Court to review educators' decisions about the services they deemed appropriate. *See Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 404 (2017)

---

[105] Br. Parent Advocates, at 9-13; Br. Appellant, at 35-43. COPAA's brief is partially copy-and-pasted from its brief in *I.Z.M. see I.Z.M.* Br. Parent Advocates, at 11-16, 21.

(warning courts not to "substitute their own notions of sound educational policy for those of the school authorities").

### D. The District did Not Act in Bad Faith or with Gross Misjudgment.

The District Court held that there is no question of material fact and that the District did not act with bad faith or gross misjudgment.[106] That conclusion is amply supported by the record and, accordingly, should be affirmed.

"In order to establish bad faith or gross misjudgment, a plaintiff must show that the defendant's conduct departed substantially from accepted professional judgment, practice or standards so as to demonstrate that the persons responsible actually did not base the decision on such a judgment." *Richardson*, 957 F.3d at 876 (quotation omitted). The standard requires more than negligence. *Bradley*, 301 F.3d at 956. It also "requires more than mere non-compliance with the applicable federal statutes," including the IDEA, Section 504, and the ADA. *B.M.*, 732 F.3d at 888-89; *Birmingham*, 220 F.3d at 856-57. Not implementing all recommendations from an independent educational evaluation ("IEE") or taking an approach that "other professionals in the field would not have recommended" is "insufficient to create a genuine dispute as to whether [the decision] represented a substantial departure from accepted professional judgment, practice, or standards." *Heidemann*, 84 F.3d at 1030-32; *Doe*, 2017 WL 8792704, at *4.

---

[106] Parents.App. 701-715; R. Doc. No. 58, at 21-35.

Instead, to demonstrate bad faith or gross misjudgment, the Parents must present "evidence regarding what an accepted professional judgment would have been under the circumstances [and] how the [District's] conduct substantially departed from such a judgment." *B.M.*, 732 F.3d at 888. To meet the standard, the "non-compliance must deviate so substantially from accepted professional judgment, practice, or standards as to demonstrate that the defendant acted with wrongful intent." *Richardson*, 957 F.3d 869 at 876-77 (quotation and internal quotation marks omitted). This is an exactingly high threshold that the Parents have failed to meet.

### 1. The District Acted in Good Faith and within Accepted Professional judgment.

There is no evidence that the District acted in bad faith or with gross misjudgment. Instead, as the District Court held, the District "did not depart grossly from accepted standards among educational professionals by convening multiple IEP meetings, extending [the Student]'s school day beyond the school day of her peers, implementing many of Dr. Reichle's suggestions into [the Student]'s IEPs, and by insuring that [the Student] always has at least one and often two aids with her at school."[107]

When the Student enrolled in its schools, the District proposed an IEP containing comparable—in fact greater—minutes of instruction than what her

Kentucky IEP provided. Specifically, after reviewing the Student's Kentucky IEP, which provided at most 215 minutes of daily special education instruction,[108] the District proposed an IEP providing 240 minutes of daily special education instruction.[109] Adopting the Kentucky IEP's goals and providing comparable service minutes satisfied the District's obligation under the IDEA and, therefore, was not a departure from acceptable professional standards. *See* 34 C.F.R. § 300.323(f).

Similarly, the District complied with the IDEA's procedural requirements by scheduling multiple IEP team meetings to discuss the Student's academic services, consider input from the Student's medical providers, and address potential revisions to her education program. 34 C.F.R. § 300.322. The IEP team frequently met to discuss the Parents' requests. The IEPs the District proposed after those meetings, incorporated several of the Parents' requests, suggestions from the Student's medical providers, and other relevant data. For example, the IEPs proposed by the District incorporated the Parents' and Student's treating neurologist's suggestion for the Student to begin school at noon and always excused the Student's morning absence.[110] The District also proposed IEPs

---

[107] Parents.App. 714-15; R. Doc. 58, at 34-35.
[108] Parents.App. 302-304; R. Doc. 33-7, 1-3
[109] Parents.App. 322-330; R. Doc. 33-10, 1-9
[110] App. 129; R. Doc. 33-11, at 2 (¶¶ 10, 11); App. 131; R. Doc. 33-12, at 1; App. 136; R. Doc. 33-15, at 2.

containing additional service minutes and provided educational services "beyond the end of the regular school day," in response to the Parents' requests.[111] At Cedar Island, the Student received 15 minutes of service beyond the end of the regular school day.[112] At Maple Grove, she received direct one-to-one special education services from a licensed special education teacher along with additional support from a one-to-one paraprofessional at school for over an hour and a half after the typical school day ended.[113] The consideration of the Parents' requests and the Student's individual needs is obvious with none of the District's 20,000 other students, as of February 2022, "receiv[ing] services quite in the way that she [did]."[114]

Against that evidence, the Parents assert that their self-serving allegations and generalized statements create a material question of fact that precludes summary judgment.[115] They do not. *See, e.g., Toler v. Reeves*, 991 F.2d 802 (8th Cir. 1993); *see also Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993); *Frevert v. Ford Motor Co.*, 614 F.3d 466, 473 (8th Cir. 2010) ("[A]

---

[111] App. 138; R. Doc. 33-16, at 1; R. Doc. 33-16, at 3-4; App. 131; R. Doc. 33-19, at 1-2; App. 136; R. Doc. R. Doc. 33-16, at 1-4.

[112] *See, e.g.*, App. 53; R. Doc. 33-4, at 47 (185:25, 186:1-18).

[113] Parents.App. 272; R. Doc. 33-4, at 451 (1020:2-25, 1021:1-11).

[114] *See* Parents.App. 80, 94-95, 105; Doc. R. 33, at 41, 55-56, 66 (164:4-6; 220:5-15, 221-22; 262:22-25).

[115] Br. Appellant, at 21.

properly supported motion for summary judgment is not defeated by self-serving affidavits").

To the extent that the Parents allege that record evidence that they failed to cite to in the District Court creates a triable fact issue, such citations are untimely. "[P]ost-judgment assertions that the record supported [a party's] claims will not avail." *White v. McDonnell Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990). Indeed, as the District Court recognized, it was "not required to speculate on which portion of the record" the Parents relied. *Id.* Nor was it "obligated to wade through and search the entire record for some specific facts that might support [the Parents'] claims." *Id.*[116]

Moreover, none of the supposed fact disputes identified by the Parents are "material," as they do not alter the conclusion that the District did not act with bad faith or gross misjudgment. For instance, the Parents unsupported assertions that there is a dispute about how many "disability discrimination" complaints the Parents made, what District policies were triggered by the complaints and whether the District complied with the policies, and Emmons' understanding of the applicable policies are immaterial.[117] As discussed above, the undisputed facts, including that the District held IEP team meetings to discuss the Parents' concerns, proposed and implemented IEPs, including IEPs that incorporated the Parents'

---

[116] *See also* Parents.App. R. Doc. 58, at 24-35

input and extending the Student's school day beyond the end of the regularly scheduled school day, and provided the Student with more—and more intensive—special education services than she received in Kentucky, amply demonstrate that the District acted neither with bad faith or gross misjudgment.

While the District IEPs did not include every suggestion the Parents made or provide all the services the Parents desired, the District was only obligated to "consider"—not "accept," "agree," or "incorporate"—parents' requests during the IEP process. *K.E. v. Independent District No. 15*, 647 F.3d 795, 805-06 (8th Cir. 2011). The District satisfied its obligation by not only discussing all the Parents' suggestions at IEP team meetings, but also incorporating several of them into the IEP. *See id.* Convening multiple IEP team meetings to consider parents' requests, as required by IDEA, is consistent with professional judgment. Disagreeing with those requests, as permitted by the IDEA, is not evidence of bad faith or gross misjudgment.

The District also complied with the IDEA's stay-put requirement by continuing to provide the Student with 4.25 hours of instruction during the dispute as to the contents of her IEP. *See* 34 C.F.R. § 300.518(a). Implementing a stay-put IEP, as required by the IDEA, is what a professional is expected to do, not a departure from professional standards and judgment. *Id.*

---

[117] Br. Appellant, at 51-55

With regard to the Parents' assertion that the District demonstrated bad faith or gross misjudgment by not following the procedural requirements contained in Section 504's implementing regulations, the District satisfied those obligations by following the IDEA procedural steps in developing, proposing, and implementing the Student's IEPs. *M.Y.*, 544 F.3d at 889. Following IDEA procedures is an accepted professional practice for satisfying Section 504 and ADA obligations towards IDEA-eligible students, not a substantial deviation that demonstrates bad faith or gross misjudgment. *See, e.g.*, 34 C.F.R. § 104.36.

> 2. **Regardless of Whether the Complied with the IDEA, Following the IDEA Process Demonstrates that the District did not act with bad Faith or Gross Misjudgment.**

Under the IDEA, it is irrelevant whether additional services would have made the IEP "ideal," maximized her potential, or provided her with the "best possible education at public expense." *See Endrew F.*, 137 S. Ct. at 399; *Minnetonka Pub. Sch., v. M.L.K. ex rel. S.K.*, 42 F.4th 847, 853 (8th Cir. 2022) (quotation omitted). Instead, the District was obligated to provide IEPs that were "reasonably calculated to enable [the Student] to make progress appropriate in light of [her] circumstances." *Endrew F.*, 137 S. Ct. at 403. While the Parents and their expert witnesses opine that the Student could have made more progress with additional services, it is indisputable that the Student made adequate progress

throughout her enrollment at the District.  Therefore, the District provided the Student a FAPE and satisfied its obligations under the IDEA.  *See id.*

If the Court agrees that the District complied with the IDEA and reverses the District Court's decision in Appellate Case No. 22-3137, the Parents' Section 504 and ADA claims are precluded and should be dismissed.  *See I.Z.M.*, 863 F.3d at 972-973 (holding that Section 504 and ADA claims are precluded when the "specific claims of unlawful discrimination all grew out of or were intertwined with [IDEA] allegations . . . [and the] allegations . . . were necessarily resolved in rejecting [the] IDEA claims"); *see also M.Y.*, 544 F.3d at 889 (citing 34 C.F.R. § 104.33(b)(2).  Trying to avoid the question of whether the District complied with the IDEA, the Parents argue—based on cases arising in employment disputes—that Section 504 and the ADA require school districts to provide "reasonable accommodations" beyond the IDEA requirements.[118]  There is no basis for agreeing with the Parents.

At the outset, as the District Court properly recognized, the term "reasonable accommodation" is a term "used in the employment context" that is "sometimes used incorrectly" to refer to schools' obligations under Section 504.[119]  Moreover, this Court has already rejected the argument that Section 504 or the ADA require

---

[118] *See, e.g.*, Br. Appellant, at 47-50.

school districts to provide students "reasonable accommodations" beyond the services contained in an IEP, and held that implementation of an IEP is "one means" of complying with Section 504. *M.Y.* 544 F.3d at 889.

Conversely, affirming the District Court's decision in the related IDEA appeal would have no impact on the Court's decision in this matter. *See, e.g., Monahan*, 687 F.2d at 1170; *see also Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs.*, 565 F.3d 1232, 1246 (10th Cir. 2009); *Mark H. v. Lemahieu,* 513 F.3d 922, 936 (9th Cir. 2008). As the Tenth Circuit Court of Appeals noted, it is a "logical fallacy" to assume that denial of FAPE under the IDEA is tantamount to discrimination. *Miller*, 565 F.3d at 1246. To the contrary, "discrimination claims may not be tacked on as an afterthought to IDEA claims," as the Parents attempted to do in this case, but, instead "must be litigated in their own right." *Id.*

In this case, the District's attempt to satisfy its IDEA obligations and provide the Student with a FAPE demonstrate that the District did not act in bad faith or with gross misjudgment. *See, e.g., B.M.*, 732 F.3d at 887; *see also K.K. v. Pittsburgh Public Schools*, 590 F. App'x 148 (3d Cir. 2014) (unpublished) (finding a school district satisfied Section 504 by taking steps to accommodate a student

---

[119] Parents.App. 701; R. Doc. 58, at 21; *See also Frequently Asked Questions About Section 504 and the Education of Children with Disabilities,* 111 LRP 76408 (OCR 2011).

and provide meaningful access to educational benefits, despite not providing FAPE under the IDEA).

The Court's decision in *B.M.* is instructive. In *B.M.*, the school district refused to conduct a Section 504 evaluation, as requested by the parents, and, instead, insisted on conducting an IDEA evaluation in lieu of a Section 504 evaluation. 732 F.3d at 885. The district also refused to conduct a Section 504 evaluation while the IDEA evaluation was ongoing. *Id.* In short, with respect to its work with the student, the school district engaged in "possible instances of statutory non-compliance," as highlighted by adverse findings from the Office for Civil Rights ("OCR"). *Id.* at 885-89, 886 n.2. Nonetheless, this Court found that those facts did not "suggest[] anything more than disagreement between a school and a concerned parent as both struggled to meet [the student's] needs" which, "[i]n light of the [school district's] persistent efforts to aid [the student]," did not create a material question of fact upon the fact that the bad faith or gross misjudgment standard was unmet. *Id.* at 887-89.

As they did before the District Court, the Parents attempt to distinguish this case from *B.M.* by relying on *M.P. ex rel. K & D.P. v. Indep. Sch. Dist. No. 721*, 326 F.3d 975 (8th Cir. 2003) and *M.P. ex rel. K & D.P. v. Indep. Sch. Dist. No.*

*721*, 439 F.3d 865 (8th Cir. 2006) (collectively, "*M.P.* cases").[120]  That reliance is misplaced; the *M.P.* cases are wholly inapposite.

In the *M.P.* cases, a school district disclosed a student's schizophrenia and declined to investigate the disclosure, which resulted in the diagnosis becoming "common knowledge" and led to the student being harassed by other students. *M.P. I*, 326 F.3d at 977-78.  The school district did not investigate, take "corrective actions," or amend the student's Section 504 plan to address that harassment.  *Id.* at 978, 982.  Instead, the District stopped answering the parent's weekly phone calls. *Id.*  The harassment continued into a second school year, to which the school district's only response was to offer a shortened school day or attendance at an alternative learning center.  *Id.* at 978.  The school district also "suggested" it would pay for transportation to a neighboring school district but refused to do so when the student enrolled in the neighboring school district.  *Id.*  Based on that record, this Court found that there was a question of material fact upon whether the school district acted with bad faith or with gross misjudgment.  *M.P. II*, 439 F.3d at 867-68.

This case is easily distinguishable from the *M.P.* cases.  The District neither disclosed information about the Student nor otherwise led to the Student being harassed by other students.  In fact, this case does not involve any harassment

---

[120] Br. Appellant, at 32-33.

allegations at all.  In fact, there is simply no comparison between the school district's actions in *M.P.* and the District's actions in this case.  Unlike the school district in *M.P.*, the District repeatedly convened IEP team meetings to consider the Parents' assertion that the Students' IEPs did not provide adequate services, proposed modified IEPs—which incorporated some of the Parents' requests—when the Student's educators felt it was appropriate, offered alternative dispute resolution under the IDEA when it became clear full agreement would be difficult to reach (which the Parents rejected), and followed through on its commitments by providing the services in the Student's IEPs.[121]  In fact, unlike the *M.P.* cases, the District's approach was successful, with the Student making progress.

While the Parents now take issue with the District addressing the Parents' concerns through the IDEA process, such an approach complies with Section 504 and the ADA, as discussed above.  Indeed, even if the District did not fully comply with Some procedural requirement—whether under the IDEA, Section 504, the ADA, or its own policies—that irregularity is nothing like the school district's intentional disregard of ongoing harassment at issue in the *M.P.* case.

Indeed, the Parents' attempt to liken a school district's failure to take any action to address ongoing student-to-student harassment caused by the school district's own disclosure of sensitive medical information with the District's

---

[121] App. 129; R. Doc. 33-11, at 2 (¶ 13).

decision to address A.T.'s assertions that the Student's IEPs violated the ADA through the IEP team process is absurd. Addressing a complaint initially made in an IEP team meeting by continuing the IEP team process is compliance with the IDEA procedural requirements and in no way equivalent to turning a blind eye to long-term harassment inflicted by other students. *M.P. I*, 326 F.3d at 977-78, 982.

Adopting such a comparison would effectively allow parents to ignore IDEA processes and the applicable standard for liability under Section 504 or the ADA by using nothing more than the right "magic words" during IEP team meetings That result would be untenable, irrational, and unjust. *See Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 169-170 (2017). Under such a standard, an educated parent— like A.T.—who knows to invoke anti-discrimination law when disagreeing with a district's proposal, would prevail on a discrimination claim. A less knowledgeable parent who merely disagrees with the same proposal—or even asserts that the same proposal violates the IDEA, instead of claiming that it is discriminatory—would not. School districts would have to immediately halt the IEP process and begin discrimination investigations whenever a parent asserts that a term discussed in an IEP team meeting violates Section 504 or the ADA which, could potentially lead to lengthy delays in the delivery of special education services. Such a requirement would also lead to a single administrator or attorney dictating the contents of the

IEP, in violation of the IDEA. 34 C.F.R. §§ 300.320-.324.[122] Congress did not intend such an absurd result. *See Arlington*, 548 U.S. at 296.

Again, the *B.M.* case is analogous and instructive. As in *B.M.*, and unlike the *M.P.* cases, the District utilized the IDEA process and made "persistent efforts to aid" the Student. *See B.M.*, 732 F.3d at 888. Specifically, the District provided the Student services designed to meet her needs. There is no dispute that the Student received 4.25 hours of intense, one-to-one (or two-to-one) instruction each day that school was in session, including time beyond the end of the regular school day. In fact, even before the ALJ's ruling, the Student received more direct, one-to-one instruction than any other student in the District, disabled or otherwise. There is also no dispute that the Student received paraprofessional support, nursing services, physical therapy, mobility services, assistive technology, and other aids and services, throughout her school day. The aids, services, and instruction provided to the Student enabled her to make progress on her IEP goals and objectives. Therefore, just as in *B.M.*, whether or not the District fully complied with the law and its policies, it acted in good faith and with accepted professional judgement. *See id.*

---

[122] Indeed, if an administrator had investigated and agreed with A.T.'s statement that he believed the District's proposals violated the ADA, as the Parents assert they should have, the determination would have effectively usurped the role of the IEP team, as the Parents speculate that District administration did.

Tellingly, the Student's educators, the Parents, their experts, and the ALJ *all* reached differing conclusions as to how many services hours were necessary for the Student to receive a FAPE.[123]  This difference in opinion demonstrates why "something more" than a mere IDEA violation is required to sustain a claim for discrimination under Section 504 and the ADA and, in this case, underscores that District staff did not act with bad faith or gross misjudgment.  *See Monahan*, 687 F.2d at 1170.

Contrary to such a finding, multiple highly respected experts have concluded that the District's actions, including the hours of instruction it provided, were reasonable and appropriate based on the Student's needs.[124]  Even the Parents' expert witnesses, who criticized many, but not all, of the District's actions did not opine that the District so far deviated from the established professional judgment as to demonstrate bad faith or gross misjudgment.[125]

### 3. There is no Per Se Requirement to Provide a Regular or Full School Day to any Student.

The Parents also argue that the District acted in bad faith or with gross misjudgment by not having a blanket policy that IDEA-eligible students must

---

[123] *See* Parents.App. 349-370; R. Doc. 33-24, at 1-22.
[124] *See* App. 29-45; R. Doc. 33-1, at 1-17; *see also* App. 188-189; R. Doc. 33-27, at 1-2; R. Doc. 33-28, at 1-58.
[125] *See, e.g.,* Parents.App. 395; R. Doc. 33-29, at 25 (91:8-13); *see also* Parents.App. 285; R. Doc. 33-5, at 10 (32:19-24).

receive the same quantity of instruction as their non-disabled peers.  For any number of reasons, that contention is meritless.

Significantly, this Court has already recognized that Section 504 and the ADA do not categorically require schools to modify their policies to allow students with disabilities to attend school for a full or regular school day.  *DeBord*, 126 F.3d at 1104, 1106.  Specifically, this Court concluded that a school district satisfied its obligations under Section 504 and the ADA when it developed a schedule that allowed a student with disabilities to leave school early to take medication at home.  *Id.*  In reaching its decision, the Court rejected the parents' argument that the school district was required to modify its medication policies to permit the student to remain in school for the entire school day.  *Id.*

The *DeBord* case is fatal to the Parents' contention that the District was required to provide students who cannot attend school during the regular school day with comparable educational services outside of the regular school day.  As did the school district in *DeBord*, the District permitted the student to come to school less than a full school day due to her medical condition.  As this Court concluded in *DeBord*, that modified schedule satisfied the District's obligation under Section 504 and the ADA.  *See* 126 F.3d at 1104, 1106.

The Supreme Court's interpretation of the IDEA supports this conclusion.  Specifically, the Supreme Court held that the term "free appropriate public

education" is "is too complex to be captured by the word "equal" whether one is speaking of opportunities or services" *Board of Education of Hendrick Hudson Central School District v. Rowley ex rel. Clifford and Nancy Rowley*, 458 U.S. 176, 198–99 (1982). Like the IDEA, Section 504 requires school districts to provide students with a "free appropriate public education." 34 C.F.R. § 104.33(a). As the Supreme Court recognized with respect to the IDEA's use of that term, the concept of a FAPE is "too complex to be captured by the word 'equal.'" *Rowley*, 458 U.S. at 198-199.

In addition, the Parents' argument is undercut by Minnesota law, which does not require all students with or without disabilities to receive the full amount of instruction made available through the annual calendar or school schedules created by school boards. *See* Minn. Stat. §§ 120A.05, subds. 11, 13; 120A.22, subd. 12. Most relevant, Section 120A.22, authorizes school districts to excuse students' absences when their physical or mental health prevents them from attending school. *Id.* The District met these obligations. The District consistently offered to provide education to the Student in accordance with its regular calendar and school schedule, if or when her health permitted, but excused the Student's absences when she could not attend.[126]

---

[126] Parents.App. 246; R. Doc. 33-4, at 315 (728-29); App. 72; R. Doc. 33-4, at 348 (859-60); App. 129; R. Doc. 33-11, at 2 (¶¶ 10, 11); App. 131; R. Doc. 33-12, at 1; App. 136; R. Doc. 33-15, at 2.

The Parents' argument that all students must categorically receive the same number of hours of instruction is also directly contrary to the IDEA. As the Fifth Circuit explained, "to presume that every child's school day should be of uniform length is at odds with the conception of individually tailored education embodied in [the IDEA]." *Christopher M. ex rel. Laveta McA. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1291 (5th Cir. 1991). Therefore, no court has "applied a presumption that a full school day is required under [the IDEA]" because the IDEA "does not imply any presumption in favor of the generally-administered length of programming." *Id.*

In short, the Parents' argument that the District was required to provide the Student with a school day "equal" in length to the regular or full school day that her non-disabled peers and many of her disabled peers received is a red herring. Neither the ADA, Section 504, Minnesota law, or the IDEA categorically require school districts to provide any student the same amount of educational services as any other student. The District satisfied the ADA, Section 504, Minnesota law, and the IDEA by modifying the Student's schedule to allow her to come to school at noon, as her Parents and medical providers requested.

In an attempt to avoid that conclusion, the Parents cite to *Christopher S. ex rel. Rita S. v. Stanislaus County Office of Education*, 384 F.3d 1205 (9th Cir. 2004) and multiple opinions from the Office for Civil Rights ("OCR") for the proposition

that Section 504 prohibited the District from providing the Student with less

instruction than other students (including students with and without a disability)

because the Student was available for education outside of the regular school

day.[127]  *Christopher S.* and the OCR decisions cited by the Parents are inapposite

and, to the extent they could be construed as applicable, actually undercut the

Parents' argument.[128]

In *Christopher S.*, the Ninth Circuit condemned a school district's "blanket

policy" as to the length of the school days for all the IDEA-eligible students in a

specific eligibility category.  384 F.3d at 1208, 1210-13, 1212 n.4, 1213 n.6.  The

Ninth Circuit held that "the instructional-day issue must be decided on an

individualized, case-by-case basis, not as a blanket across-the-board matter."  *Id.*

The court further held that "a reduction in hours is valid in principle if it is

contemplated by the child's [IEP] . . . ."  *Id.*  There is no evidence that the District

had a blanket policy such as the one at issue in *Christopher S.*  Instead, as

demonstrated by the fact that the length of the Student's school day is contained in

her IEP, the District individualized the Student's educational day based on her

---

[127] Br. Appellant, at 32-33, 44-45.

[128] The Parents' citation to *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138 (2d Cir. 2002) also does not support their argument.  That case addressed the "difficult dilemma" of reviewing a *pro se* plaintiff's complaint on a motion to dismiss.  *Id.* at 141.  Such a holding is entirely inapposite to this case.

unique situation. Specifically, the Student's school day started after and continued beyond the school day of her peers based on her individual need.

The OCR decisions cited by the Parents likewise involved situations where a school district applied an across-the board policy limiting the amount of instruction to students with disabilities without going through the IEP team process or making any individualized determinations.[129]

Attempting to shoehorn these inapposite decisions into this matter, the Parents allege that the Student's educators' consideration of various factors other than the Student's individual needs during the IDEA process are equivalent to having a blanket policy limiting the education provided to all students with disabilities or doing nothing.[130] This contention, once again, amounts to nothing more than an argument that, because the District violated the procedural requirements of the IDEA, it also discriminated against the Student in violation of Section 504 or the ADA. That "logical fallacy" is not supported by the law. *Miller*, 565 F.3d at 1246. Indeed, the Parents have not identified a single case, OCR decision, or any other authority that supports their contention that a school district violates Section 504 or the ADA by shortening a student's school day through the IEP team process, even if that process was flawed or the educators relied on improper factors in the that process. The Parents' argument about an

---

[129] *See* Br. Appellant, at 44-45.

"equal" school day is nothing more than a repackaging of their IDEA claims. As with other Section 504 or ADA claims involving the education of students with disabilities, the applicable question is whether the District engaged in bad faith or with gross misjudgment in following the IDEA process. As discussed herein, it did not, which ends the inquiry and correctly results in the dismissal of the Parents' ADA and Section 504 claims.

## III. THE DISTRICT DID NOT VIOLATE SECTION 504 UNDER ANY STANDARD.

After holding that the District did not act with bad faith or gross misjudgment, the District Court declined to reach the other required elements of the Parents' Section 504 or ADA claim.[131] For the reasons discussed above, this Court is not required to reach those elements either. Nevertheless, regardless of the application of any intent standard, the there is no material question of fact that the Student was not denied any benefits of a program or activity of the District based on her disability. Therefore, the District did not violate Section 504 or the ADA.

### A. The Legal Standard.

To state a prima facie case under Section 504 or the ADA, in addition to bad faith or gross misjudgment, the Parents must show that the Student: "(1) is a

---

[130] Br. Appellant, at 32-33, 44-45.
[131] Parents.App. 697-98; R. Doc. 58, at 17-18.

qualified individual with a disability; (2) was denied the benefits of a program or activity of [the District]; and (3) was discriminated against based on her disability." *M.Y.*, 544 F.3d at 888 (citation omitted); *see also Baker*, 2023 WL 4778203, at *3 (holding that "the enforcement, remedies, and rights are the same" under Section 504 and the ADA (quotation omitted)); *Hoekstra*, 103 F.3d at 626 (holding that this Court "consistently applie[s] § 504 case law to ADA cases"). While it is undisputed that the Student is a qualified individual with a disability, the District did not deprive her of any benefit of its programs or activities, and did not discriminate against her.

### B. The District Did Not Deny the Student Any Benefits of a Program or Activity of the District Based on her Disability.

"To succeed on their claims under [Section 504 or the ADA], the [Parents] must show the school district refused to [provide afterschool, at-home instruction unnecessary for a FAPE to create an 'equal' school day] *because of her disability*." *DeBord*, 126 F.3d at 1105 (emphasis added). The Parents cannot support that burden. The Student was not denied any benefits of a program or activity of the District based on her disability. The District did not deny the Student any instruction or any opportunity that it provided to any other student, with or without disabilities. There is no dispute that the District allowed the Student to come to school when she was able to do so, and properly excused her from attendance when she could not.

The Parents' argument that the District has other after school programs in no way detracts from that conclusion. The District did not prohibit the Student from attending any afterschool program. The District did not "assume an inability" on the Student's part to prohibit her from attending any program. *See Southeastern Community College v. Davis*, 442 U.S. 397, 405 (1979) (holding that Section 504's language prohibiting exclusion "indicat[es] only that mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context"). To the contrary, the District encouraged the Student to attend the school at the same time as her non-disabled peers, whenever she was able to do so. In addition, it is undisputed that the Student is the Student unique, intensive educational services including beyond the end of the regular school day.[132] Nor is there any evidence that the District provided the type of in-home, afterschool instruction the Parents sought to any student without disabilities.[133] Simply put, the District did not exclude the Student from any of its program or activities, much less because of her disability.

This Court's decision in *DeBord* is again instructive. In that case, the school district refused to modify its "objective standard" prohibiting the administration of prescription drugs beyond the recommended dosage to a student with a disability

---

[132] See App. 80, 94-95, 105; Doc. R. 33 at, 41, 55-56, 66 (164:4-6; 220:5-15, 221-22; 262:22-25).
[133] *Id.*

even though the student needed a dosage beyond the recommend level to attend school for the full day.  126 F.3d at 1104-06.  Nevertheless, because the school district "did not knowingly administer prescription drugs to any student, disabled or not, in excess of the [the recommended level]" the Court concluded that its refusal to modify its policy did not amount to unlawful discrimination on the basis of disability.  *Id.* at 1105-06.

As in *DeBord*, there is "no evidence" that the District had "disability in mind when formulating or implementing" "class schedules" for its schools.  Similar to in *DeBord*, the District did not provide at-home, after-school instruction to any non-disabled student that was excused for parts of one or more school days.  126 F.3d at 1104-06.  As the Court concluded in *DeBord*, the District did not discriminate against the Student in violation of Section 504 or the ADA.

**C.      The District did not Intentionally Discriminate Against the Student.**

The conduct the Parents challenge in this case—the development and implementation of IEPs containing a modified school day—falls far short of meeting any culpability standard advanced by the Parents or the COPAA.  To the contrary, the fact that, the District reasonably responded to the disagreement over the length of the Student's school day by making persistent efforts through the IDEA process in a situation where the Student was making progress, is fatal to the Parents' claim under the deliberate indifference standard.  *See Barnwell*, 880 F.3d

at 1006-07 (holding that if the deliberate indifference standard applied it was unmet, just as with the bad faith or gross misjudgment standard, because the school district's response was not "clearly unreasonable" and the discrimination was not "so severe, pervasive, and objectively offensive" that it deprived the student educational opportunities or benefits).

## CONCLUSION

There is no material fact dispute that defeats the conclusion that the District did not act with the bad faith or gross misjudgment requisite to the Parents' claims under the ADA or Section 504.  To the extent that the Parents ask the Court to apply a different standard, there is neither legal basis, nor policy reason to deviate from over 40 years of precedent.  Nor would adopting any different standard affect the outcome of this case.  Under any standard, there is no evidence to support a conclusion that the District excluded the Student or deprived her from the benefits of any of its education programs or activities.

Based on the foregoing, the District respectfully requests that this Court affirm the District Court's Order granting the District's Motion for Summary Judgment and to again reaffirm the longstanding precedent underlying that Order.


[SIGNATURE BLOCK ON NEXT PAGE]

Respectfully submitted,

**RATWIK, ROSZAK & MALONEY, P.A.**

Dated: August 23, 2023          By: */s/ Christian R. Shafer*
                                      Laura Tubbs Booth (#0186910)
                                      Christian R. Shafer (#0387947)
                                      Adam J. Frudden (#0400068)
                                      444 Cedar St., Suite 2100
                                      St. Paul, MN 55101
                                      (612) 339-0060
                                      ltb@ratwiklaw.com
                                      crs@ratwiklaw.com
                                      ajf@ratwiklaw.com

# CERTIFICATE OF COMPLIANCE WITH FRAP 28.1(e)(2)

Christian R. Shafer, attorney for Defendants - Appellees Osseo Area Schools, Independent School District No. 279 and Osseo School Board, hereby certifies that this Brief complies with the requirements of Rule of Civil Appellate Procedure 32(a)(7)(B) and Eighth Circuit Rules and Procedures 28A(h). This Brief was prepared using Microsoft Word, font face size 14, containing 12,906 words. The word count is stated in reliance on Microsoft Word for 365, the word processing program used to prepare this Brief.

The undersigned also certifies that this Brief has been scanned for viruses and is virus-free.

**RATWIK, ROSZAK & MALONEY, P.A.**

Dated: August 23, 2023          By: */s/ Christian R. Shafer*
                                      Christian R. Shafer

## CERTIFICATE OF SERVICE

Christian R. Shafer, attorney for Defendants - Appellees Osseo Area Schools, Independent School District No. 279 and Osseo School Board, hereby certifies that a copy of the foregoing Brief was served electronically on August 23, 2023, on all parties of record by the Court's ECF system.

**RATWIK, ROSZAK & MALONEY, P.A.**

Dated: August 23, 2023     By: */s/ Christian R. Shafer*
                                   Christian R. Shafer